

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 12, 2022

**BY ECF**
The Honorable Andrew L. Carter
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States* v. *Kevin Crosby*, 21 Cr. 673 (ALC)

Dear Judge Carter:

      Defendant Kevin Crosby, a/k/a "Sama," ("Crosby" or "the defendant"), is scheduled to be sentenced on December 15, 2022, at 2:00 p.m., having pled guilty to Count Two of Indictment 21 Cr. 673 (ALC) (the "Indictment"), which charged Crosby with conspiring to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349. Pursuant to a plea agreement between the parties, the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range is 21 to 27 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons below, the Government submits that a sentence within the Stipulated Guidelines Range, to run consecutive to the sentence Crosby is serving as result of his federal convictions for conspiracy to commit murder in aid of racketeering and assault with a deadly weapon in aid of racketeering, 19 Cr. 625 (JMF), is warranted in this case.

## I.   Background

### A.   The Bureau of Prisons and the Metropolitan Correctional Center

      In New York City, between October 2019 and January 2021, the United States Marshals Service ("USMS") housed pretrial detainees at several locations, including the Metropolitan Correctional Center ("MCC") in Manhattan. The MCC employed more than 110 correctional staff, including Correctional Officers, Senior Officers, and Senior Officer Specialists. The primary duty of Correctional Officers, Senior Officers, and Senior Officer Specialists was to ensure the care, custody, and control of the inmate population of the MCC. In connection with this duty, such officers participated in inspections and searches of inmates and the MCC facilities, and were tasked with, among other things, ensuring that contraband was not brought into or distributed in the MCC.

According to the BOP's Standards of Employee Conduct (the "Standards of Employee Conduct"), employees of the MCC were expressly forbidden from "offer[ing] or giv[ing] to an inmate or a former inmate or any member of his/her family, or to any person known to be associated with an inmate or former inmate, any article, favor, or service that is not authorized in the performance of the employee's duties" and from "accept[ing] any gift, personal service, or favor from an inmate or former inmate, or from anyone known to be associated with or related to an inmate or former inmate." Nor were employees of the MCC allowed to become "financially involved with inmates, former inmates, or persons known (or who should have been known based on circumstances) to the employee as a family member or close friend of inmates or former inmates." Contraband was defined as "material prohibited by law, or by regulation, or material which can reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of the institution." Cellphones, narcotics, alcohol, firearms, and weapons, among other items, were all considered contraband.

### B.    Investigation Into Contraband Smuggling and Distribution

This case arises from an investigation conducted by the Federal Bureau of Investigation, the Department of Justice's Office of the Inspector General, and the United States Attorney's Office for the Southern District of New York into a network of inmates at the MCC—including, but not limited to, Crosby and codefendants David Valerio, Starlin Nunez, Virgilio Acevedo de los Santos, Donnell Murray, Markeen Jordan, Anthony Ellison, and Tyrell Sumpter (collectively, the "Inmates")—who worked together and with others, to smuggle contraband into the MCC, including oxycodone, alprazolam, buprenorphine, naloxone (often referred to as Suboxone), marijuana, smokable synthetic cannabinoids (often referred to as K2), cellphones, cellphone accessories, alcohol, and cigarettes. From there, the Inmates used, sold, and exchanged that contraband amongst themselves and resold it to other inmates.

In some instances, the Inmates relied on associates, such as girlfriends, to smuggle contraband into the MCC during visiting days. On others, certain Correctional Officers—primarily Perry Joyner, but also Mario Feliciano and Sharon Griffith-McKnight—provided or agreed to provide the Inmates with contraband often in exchange for financial bribes. With respect to Joyner in particular, the Inmates typically paid him through intermediaries via mobile payment applications such as Cash App or Zelle. From at least Fall 2019 through February 2020, Joyner personally smuggled contraband, including Percocet, marijuana, K2, cellphones, and cigarettes into the MCC and provided it to the Inmates in exchange for substantial payments. Joyner used at least four "burner" cellphones to communicate with the Inmates, who in turn used contraband cellphones that they stored in the MCC.

### C.    Crosby's Participation

Inmates Crosby and Murray were Joyner's primary inmate co-conspirators housed on MCC Unit 7 North. They purchased cellphones, cigarettes, and drugs, including K2 and Percocet, from Joyner and/or other inmates at the MCC, and frequently resold or otherwise distributed these items to other inmates.

Crosby first arrived at the MCC in September 2019, having been arrested for racketeering offenses, including conspiring to murder a rival gang member in January 2019, and was then

remanded to pretrial custody. The maximum penalty Crosby faced for that conduct was, as charged, death or life imprisonment. On January 24, 2020, the Government notified the Court and parties that the then-Acting Attorney General decided not to seek the death penalty against Crosby. *United States v. Robert Wilson, et al.*, 19 Cr. 625 (JMF), ECF No. 45 (Jan. 24, 2020).

Crosby was assigned to 7 North upon his arrival at the MCC and, from mid-December 2019 through February 2020, Crosby was Murray's bunkmate. The Government's evidence against Crosby includes, among other things, the contents of a contraband cellphone that Crosby used (the "Crosby Contraband Cellphone") and that was recovered from the MCC, witness information, financial records, seized contraband, and cellphone records and electronic communications.

The Crosby Contraband Cellphone in particular showed that in late January 2020, Crosby coordinated the smuggling into the MCC of, among other items, Percocet pills, K2, rolling papers, and cartons of cigarettes. For example, on January 25, 2020—*i.e.*, the day *after* the Government notified the Court and parties that it would not seek the death penalty against Crosby—Crosby directed a non-inmate co-conspirator to "pick up something from [another non-inmate co-conspirator] and take it to" 170th Street in Manhattan.

Two days later, on January 27, 2020, Crosby coordinated with non-inmate co-conspirators to handoff to Joyner a package of contraband for Joyner to smuggle into the MCC later that evening. At approximately 9:49 p.m. that night, Crosby asked a co-conspirator to "send me a pic of all the shit please," and in response Crosby received the following picture, which depicts Percocet pills, K2, rolling papers, cartons of cigarettes, and food:



      In the early morning hours of January 28th, Joyner started a shift on 7 North, Crosby's unit, that began at 12:00 a.m.  Crosby's subsequent text messages make clear that Joyner smuggled to him the above-described contraband.  On February 4, 2020, for example, Crosby sent an unknown individual the picture below, which is of Crosby himself holding a large plastic bag containing a green leafy substance.  After receiving the picture, the unknown individual stated, "That look like mad k2," with Crosby admitting "That's exactly what it is."



Cash App records and messages recovered from seized contraband cellphones revealed that Crosby used a Cash App account in the name of Crosby's mother to buy and sell contraband. These records show that Crosby frequently sent money to a Cash App account maintained in the name of Murray's wife, an account that itself paid two associates of Joyner at least approximately $16,000 during the conspiracy. In particular, the records show that between January 7, 2020 and January 28, 2020 (the three weeks prior to Joyner smuggling into the MCC the contraband depicted in the above pictures), the Cash App account in Crosby's mother's name sent approximately $3,320 to the Cash App account in the name of Murray's wife.

The same Cash App records for Crosby's mother further show that, between October 2019 and May 2020, Crosby received approximately 14 incoming payments totaling $1,254 from inmates or the known associates of inmates, representing Crosby's ill-gotten gains from the offense.

In addition, although phone records suggest that Crosby did not communicate directly with Joyner in a sustained manner, Crosby's bunkmate, Murray, did so communicate with Joyner. Crosby was bunkmates with Murray when Crosby coordinated the contraband smuggling described above. On February 27, 2020, BOP employees seized from Murray and Crosby's shared cell several contraband cellphones, including the Crosby Contraband Cellphone and one used predominantly by Murray that contained communications with at least one burner cellphone used by Joyner.

### D. Crosby's Racketeering Case

On April 5, 2021, Crosby pled guilty to one count of conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 371, and one count of assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3).

On February 18, 2022, Crosby was sentenced to a total term of imprisonment of 300 months, to be followed by a term of supervised release of three years.

## II. Guilty Plea, PSR, and Defendant's Submission

On November 3, 2021, a grand jury in this District returned the Indictment, charging Crosby in three counts, including conspiracy to smuggle contraband into the MCC, in violation of 18 U.S.C. § 371 (Count One), honest services wire fraud, in violation of 18 U.S.C. § 1349 (Count Two), and conspiracy to distribute controlled substances in the MCC, in violation of 21 U.S.C. § 846 (Count Three). An arrest warrant for Crosby, who was already in custody, was effected on December 14, 2021.

On September 29, 2022, Crosby pled guilty to Count Two pursuant to a plea agreement, which included the Stipulated Guidelines Range (21 to 27 months' imprisonment). As part of his plea agreement, Crosby agreed to forfeit $1,254, representing his proceeds of committing Count Two, and at the plea hearing the parties executed and the Court accepted a preliminary order of forfeiture.

In its Presentence Report ("PSR"), the Probation Department agreed with the parties' guidelines calculation and recommended a bottom-of-the-Guidelines sentence of 21 months to run consecutive to the 300 month sentence that Crosby is currently serving, and a three-year term of supervised release to run concurrent to the term of supervised release imposed in Crosby's racketeering case. (PSR pp. 28-29.)

In a sentencing memorandum filed on December 8, 2022, Crosby asks the Court to impose a sentence of 21 months' imprisonment to run concurrent to his 300 months sentence. (ECF No. 176.)

## III. Discussion

### A. Applicable Law

The Guidelines, while no longer mandatory, still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005). A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a)

objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46. To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

> **B.  A Consecutive Sentence within the Stipulated Guidelines Range Is Appropriate**

Consideration of the factors set forth in 18 U.S.C. § 3553(a) weighs strongly in favor of a sentence within the Stipulated Guidelines Range that runs consecutive to the 300 month sentence that Crosby is currently serving.

Crosby's conduct was serious. It was significant and contemplated. He played an integral role in a criminal network engaged in smuggling in and redistributing drugs, alcohol, cellphones, and other contraband in a federal prison. Crosby's own participation in that scheme spanned at least seven months, and included the possession, use, and distribution of Percocet pills, K2, and cigarettes. It has frequently been reported that federal prisons are rife with illegal contraband, from cellphones to cigarettes to alcohol to all forms of drugs. This contraband introduces an additional layer of dangerousness into an already precarious environment by presenting the risk of inmates becoming addicted to drugs, relapsing, or even overdosing, as well as violent conflict over prison drug or contraband turf. Similarly, it exponentially heightens the security risk inmates present to the public, which should be close to non-existent when they are detained in a correctional institution, by giving them the opportunity to use contraband cellphones to surreptitiously communicate with coconspirators, conduct ongoing criminal activity, and order acts of violence, all from within their prison cells. In short, Crosby, through his distribution of contraband, made the MCC a significantly more dangerous environment, and he should receive a Guidelines sentence for that serious crime. That sentence should be consecutive to the 300-month sentence he is serving, because, among other reasons, the harm caused by the instant conduct is totally distinct from that caused by Crosby's prior offense. A sentence that imposes no marginal consecutive punishment will therefore fail to reflect the seriousness of the instant conduct.

A significant sentence is also necessary to afford adequate specific and general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). With respect to specific deterrence, the instant offense represents Crosby's fourth known conviction and fifth arrest. Crosby committed this offense while in pretrial custody for charges that carried with them a maximum penalty of death and, significantly, while the Government was considering whether to seek the death penalty in that case. At a time when Crosby had every incentive to be on his best behavior, he engaged in additional felonious conduct. A significant, consecutive sentence is necessary to drive home to Crosby that continued criminal conduct will be met with serious consequences.

A significant sentence is also necessary to deter others from smuggling into correctional facilities drugs and other illicit materials. This Court previously observed when sentencing Crosby's co-defendant, David Valerio, to a term of 29 months' imprisonment, that the need for general deterrence is particularly acute in this case:

> I'm concerned about generally deterring the people who are currently in jail. If someone is currently in a federal prison and they are saying, I could get engaged in some scheme to smuggle contraband into this prison with some people from the outside, maybe some COs, and if all I'm risking is six months, why don't I do that if I can make money to help me with my commissary while I'm in here, get some drugs so that I can get high, get some other things to increase my status, why wouldn't they, in terms of weighing the risk and benefits, do that for six months and maybe not for some higher amount of sentence?

Sentencing Tr., *United States v. David Valerio*, 21 Cr. 673 (ALC), at 14.  The Court is correct to be concerned: if bribing correctional officers to obtain and distribute dangerous contraband within the confines of a federal detention center is met with sentences that run concurrent to previously imposed sentences or with sentences that are the equivalent of time-served, it will convey there is virtually no consequence or downside for committing new crimes while in custody.  A significant sentence that runs consecutive to any previously imposed sentence, on the other hand, will send a clear message that reoffending while incarcerated will not be tolerated.

Finally, consideration of Crosby's history and characteristics does not militate in favor of the concurrent sentence he seeks.  There can be no dispute that Crosby experienced a difficult upbringing.  But it also cannot be disputed that Crosby has previously faced—and overcome—many obstacles.  The testaments to Crosby's character, as set forth in the defense submission, highlight many positive traits, including his work with community groups and purchase of school supplies for children in his neighborhood.  Those testaments, however, also demonstrate a plain truth: the public and Crosby's network of family members, friends, and community members deserved far more from a man of Crosby's potential.

C. **Relative Culpability**

The Government views Crosby's culpability to be slightly less culpable than Valerio, whom the Government identified as the fourth or fifth most culpable of the eight former MCC inmates who were charged in the Indictment.  Crosby's participation in the scheme was sustained in a similar manner to Valerio's participation and just like Valerio he was responsible for directly coordinating the smuggling of numerous contraband items, including drugs, for his use and redistribution for profit.  By contrast, Crosby does not appear to have communicated as directly with Joyner as Valerio did.  That is likely a function of Crosby's bunkmate, Murray, directly communicating with Joyner and serving as Joyner's primary contact on 7 North.

## IV. Conclusion

For these reasons, the Government respectfully submits that a consecutive sentence of incarceration within the Stipulated Guidelines Range of 21 to 27 months' imprisonment is warranted.[1]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for
the Southern District of New York

By: _____/s/_____
Aline R. Flodr
Jonathan E. Rebold
Daniel H. Wolf
Assistant United States Attorneys
(212) 637-1110 / 2512 / 2337

cc: Counsel of record (via ECF)

---

[1] The Government also respectfully requests that during the sentencing proceeding, the Court orally order forfeiture in the amount of $1,254, as reflected in the previously entered Consent Preliminary Order of Forfeiture.